# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                        **Plaintiff,**<br><br>                   **v.**<br><br>**JOSEPH ANDREW PAUL,**<br>**JOHN D. ELLIS, JR.,**<br>**JAMES S. QUAY,**<br>  **a/k/a "STEPHEN JAMESON," and**<br>**DONALD H. ELLISON,**<br><br>                        **Defendants.** | Civil Action No. 16-1326 (CMR) |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
PROPOSED STATEMENT OF STIPULATED MATERIAL FACTS PURSUANT
TO THE COURT'S REQUIRED PROCEDURE ON SUMMARY JUDGMENT**

Pursuant to the Court's Required Procedure on Summary Judgment for Those Moving Under Rule 56, Plaintiff Securities and Exchange Commission (the "Commission") submits the following Proposed Statement of Stipulated Material Facts for the consideration of Defendants Joseph Paul ("Paul") and James Quay ("Quay"). The Commission offers its Proposed Statement of Stipulated Material Facts for the limited purpose of the meet-and-confer requirement set forth in paragraph 1 of the Court's Required Procedure on Summary Judgment.

**CRIMINAL CONVICTIONS**

1. On July 19, 2017, the Clerk of Court unimpounded an indictment charging Paul and Quay with securities fraud in violation of 18 U.S.C. § 1348 (Counts One and Two) and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] (Count Three).

2. The elements of securities fraud in violation of 18 U.S.C. § 1348 require (1) that the defendant knowingly executed, or attempted to execute, a scheme or artifice to: (a) defraud any person; (b) in connection with any security; (i) of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934; or (ii) that is required to file reports under Section 15(d) of the Securities Exchange Act of 1934; or (a) obtain by means of false or fraudulent pretenses, representations, or promises, any money or property; (b) in connection with the purchase or sale of any security; (i) of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934; or (ii) that is required to file reports under Section 15(d) of the Securities Exchange Act of 1934; and (2) that the defendant acted with an intent to defraud.

3. The elements of securities fraud in violation of 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5, require (1) that the defendant (a) knowingly employed a device, scheme, or artifice to defraud; or (b) knowingly made an untrue statement of a material fact, or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) knowingly engaged in a transaction, practice, or course of business that operated or would operate as a fraud and deceit on any person; (2) that the defendant did so in connection with the purchase or sale of a security; (3) that the defendant made use of, or caused the use of, (a) any means or instrumentality of interstate commerce, or (b) the mails, or (c)

any facility of any national securities exchange, and; (4) that the defendant acted knowingly, willfully, and with the intent to defraud.

4. On December 17, 2018, Paul pleaded guilty to all three Counts of the Indictment.

5. The Court imposed judgment as to Paul on June 29, 2021. (Crim. Dkt. No. 194).

6. On June 14, 2019, Quay pleaded guilty to Counts Two and Three of the Indictment. (*See* Crim. Dkt. No. 223 ("Quay Plea Tr.")).

7. The Court imposed judgment as to Quay on February 18, 2020. (Crim. Dkt. No. 151).

8. Count One of the Indictment relates to Paul's role in soliciting investments from the Summit investors, as described in paragraphs 32 through 45, below.

9. Counts Two and Three of the Indictment relate to Paul and Quay's roles in soliciting investments from the Aptus investors, as described in paragraphs 46 through 66, below.

### PAUL AND PAUL-ELLIS INVESTMENT ASSOCIATES LLC

10. On January 25, 2012, Paul appeared at the Commission's Philadelphia Regional Office and gave sworn testimony. ("Paul Tr.").

11. Paul co-founded Paul-Ellis Investment Associates LLC ("PEIA") together with John D. Ellis prior to 2010. (*See* Paul Tr. 50:7-19).

12. Before co-founding PEIA, Paul held Series 6, 7, and 66 licenses and served as a registered representative associated with various firms. (Paul Tr. 21:10-20; 22:25-28:21).

13. PEIA was a Pennsylvania limited liability company, registered with the Commission as an Investment Adviser under Rule 203A-2(d) in 2009.

14. Paul was aware that PEIA was registered with the Commission as an Investment Adviser. (Paul Tr. 53:25-54:8).

3

15. Between December 2009 and October 2011, PEIA filed Forms ADV with the Commission stating that PEIA managed $30 million in assets.

16. Paul was aware that, as a registered Investment Adviser, PEIA filed Forms ADV with the Commission.  (Paul Tr. 54:9-19).

17. Paul was involved with filing PEIA's Forms ADV.  (Paul Tr. 54:9-19).

## QUAY AND APTUS PLANNING LLC

18. On January 14, 2014, Quay appeared at the Commission's Atlanta Regional Office and gave sworn testimony.  ("Quay Tr.").

19. Quay co-founded Aptus Planning LLC ("Aptus") in 2011.  (Quay Tr. 19:3-21:11; Quay Plea Tr. 37:10-12).

20. Aptus was a Florida limited liability company which purported to provide estate planning services, among other things.  (*See* Quay Tr. 52:19-53:2; Quay Plea Tr. 37:12-15).

21. Quay spoke at free dinner seminars in the Tampa area to solicit clients for Aptus.  Attendees included senior citizens whom Quay had invited via mass mailings.  (Quay Tr. 10:3-11:3; 16:17-18:20).

22. Between 2010 and December 2012, Quay used the alias "Stephen Jameson."  (*See* Quay Tr. 11:16-12:4; Quay Plea Tr. 39:2-9).

23. Quay used an alias to conceal from prospective investors that he had previously been convicted of tax fraud.  (Quay Tr. 11:16-12:4; Quay Plea Tr. 38:20-39:1).

24. Accordingly, when speaking to prospective clients or investors, Quay did not reveal:

    a.  His real name;

    b.  That he had been disbarred; or

    c.  That he had been convicted of tax fraud (Quay Plea Tr. 38:10-39:1).

**OFFERING MATERIALS**

25. Paul and Ellis created offering materials to solicit investment in PEIA.  (*See* Paul Tr. 164:11-165:4).

26. These materials included a prospectus, marketing brochures, PowerPoint presentations, and a website (collectively, the "PEIA Offering Materials").

27. The PEIA Offering Materials contained:

    a.  Charts depicting annual returns for PEIA's investment strategies ranging from 8.51% to 56.24%;

    b.  Representations that Paul and Ellis had extensive experience and generated such returns through proprietary investment strategies;

    c.  Representations that PEIA had between $150 million and $164 million in "assets under advisement."  (*See* Paul Tr. 192:12-193:4).

28. Paul and Ellis copied information relating to investment strategies, which appeared in the PEIA Offering Materials, from the website of another investment adviser.  (*See* Paul Tr. 187:24-188:13).

29. The performance numbers in the PEIA Offering Materials were also copied from other sources, and did not represent the actual performance of PEIA during this period.

30. In his sworn testimony before the Commission, Paul said that PEIA had at most had between $8 million and $10 million dollars under management.  (Paul Tr. 193:5-11).

31. In fact, PEIA never managed more than $4 million dollars during this period.

**SUMMIT INVESTORS**

32. Paul and Ellis met in mid-September of 2010 with officers of the Summit Trust Company ("Summit").

5

33. Summit was a Nevada-chartered trust company purporting to offer trust administration and estate planning services, among other things.

34. Paul and Ellis showed the Summit officers materials including a PowerPoint presentation. The presentation said, among other things, that:

    a. PEIA had $150 million in assets under advisement;

    b. PEIA's "Strategic Growth Portfolio" had generated average annual returns of 25.13% between 2000 and 2009.

35. Following this meeting with Paul and Ellis, Summit retained PEIA as its investment adviser.

36. Summit subsequently invested in PEIA's "Strategic Growth Portfolio."

37. In December 2010, Paul and Ellis met again with Summit officers. At this meeting, Paul and Ellis:

    a. Recommended investment in PEIA's "Quantitative Portfolio" and;

    b. Presented a PowerPoint stating that the "Quantitative Portfolio" had generated annual returns from 36% to 107% between 2008 and 2010.

38. The annual return data Paul and Ellis presented at this meeting were false.

39. Following this meeting, Summit invested additional sums with PEIA.

40. In total, Paul and Ellis obtained $2,672,573 from Summit.

41. Summit ultimately withdrew its funds from PEIA. (*See* Paul Tr. 159:16-18).

42. When Summit withdrew the last of its funds from PEIA on November 2, 2011, it had suffered losses of approximately $744,330.

43. Paul and Ellis had also charged Summit $8,824 in advisory fees by November of 2011.

6

44. During the five-year period between April 1, 2011 and April 1, 2016, PEIA charged the Summit investors $2,200 in advisory fees.

45. During the five-year period between April 1, 2011 and April 1, 2016, the Summit investors lost $400,000 of their investment with PEIA.

<b>APTUS INVESTORS</b>

46. In 2011, Paul and Ellis marketed PEIA to Quay in his capacity as co-owner of Aptus.

47. Quay subsequently solicited investors for PEIA.

48. Paul and Ellis provided Quay with marketing materials including a brochure purporting to describe PEIA's "Volatility Arbitrage Portfolio" (the "VAP Brochure").  (Quay Tr. 69:9-17; *see also* Paul Tr. 177:13-179:3).

49. Among other things, the VAP Brochure stated:

   a.   The Volatility Arbitrage Portfolio was a conservative investment strategy rising only 10% of an investor's principal investment; and

   b.   Between 2008 and July 2011, the strategy had generated annual returns of 46.70%.

50.  These statements in the VAP Brochure were false.

51. Quay did no due diligence regarding the VAP Brochure's claims.  (*See* Quay Plea Tr. 38:1-9).

52. Quay used PEIA's VAP Brochure to solicit investments in PEIA.  (Quay Tr. 69:9-71:1).

53.  Quay showed the VAP Brochure to prospective clients at Aptus' office, where Quay held individual meetings with investors.  (Quay Tr. 75:24-76:8).

54. At one such consultation, Quay told an investor that PEIA's Volatility Arbitrage Portfolio:

   a.   Would provide double-digit returns with low risk;

7

   b.  Exposed less than 5% of the investor's portfolio to market risk; and

   c.  Was averaging triple-digit returns.

55. Quay successfully solicited fourteen investors for PEIA.

56. These investors sent a total of approximately $1,295,000 to PEIA.  (Quay Plea Tr. 39:10-13).

57. Funds from these investors solicited by Quay were wired to a PEIA account controlled by Ellis.

58. Paul and Ellis used approximately $450,000 of these funds to pay personal and business expenses.

59. In April 2012, Ellis wired the remaining balance of the funds received from the Aptus investors to a second PEIA account he controlled.

60. Between May 2012 and November 2012, Paul and Ellis used these funds to pay personal and business expenses.

61. On May 17, 2012, Ellis wired $385,900 of the Aptus investors' funds to a bank account Quay controlled.  (*See* Quay Plea Tr. 39:22-40:4).

62. Quay used the funds for trading, including to satisfy outstanding margin calls in his own brokerage account.

63. By July 12, 2012, Quay had exhausted the Aptus investors' funds received from Ellis. (Quay Plea Tr. 40:1-6).

64. Quay told certain Aptus investors that he was generating positive returns with their investments.  (Quay Plea Tr. 40:13-16).

65. In fact, the investors' funds had already been lost.  (Quay Plea Tr. 40:16-18).

66. In total, the Aptus investors lost $1,153,503.91 of the funds they invested with PEIA.

8